# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**WHITE HALL PHARMACY LLC**                                          **PLAINTIFF**
**d/b/a DOCTOR'S ORDERS d/b/a**
**DOCTOR'S ORDERS PHARMACY**

**v.**                            **Case No. 4:19-cv-00366-KGB**

**DOCTOR'S ORDERS RX INC,** *et al.*                              **DEFENDANTS**

## PRELIMINARY INJUNCTION ORDER

Before the Court is plaintiff White Hall Pharmacy LLC d/b/a Doctor's Orders d/b/a Doctor's Orders Pharmacy's ("White Hall Pharmacy")[1] emergency motion for preliminary injunction (Dkt. No. 2). White Hall Pharmacy seeks injunctive relief against defendants Doctor's Orders RX Inc., Doctors Orders of Garland County LLC d/b/a Arkannabis d/b/a Arkannabis Extracts d/b/a Arkannabis Farms, and Don Sears. White Hall Pharmacy has filed a notice of voluntary dismissal against separate defendant Doctor's Orders of Garland County LLC (Dkt. No. 25). Separate defendants Doctor's Orders RX Inc. and Mr. Sears have responded in opposition to the emergency motion for preliminary injunction (Dkt. No. 29). For the reasons discussed below, on the record currently before it, the Court grants in part White Hall Pharmacy's emergency motion for preliminary injunction (Dkt. No. 2).

Additionally, the Court finds that White Hall Pharmacy's notice of voluntary dismissal accords with the terms of Federal Rule of Civil Procedure 41(a)(1)(A)(i). The Court therefore dismisses without prejudice separate defendant Doctor's Orders of Garland County LLC. Accordingly, to the extent the Court in this Order refers to "defendants," the Court is referring only to Doctor's Orders RX Inc. and Mr. Sears.

---

[1] At various times in the filings, the parties refer to "White Hall Pharmacy" as "Whitehall Pharmacy." For consistency's sake, the Court has opted to use "White Hall Pharmacy."

## I.    Procedural Posture

White Hall Pharmacy filed its complaint and emergency motion for preliminary injunction on May 22, 2019 (Dkt. Nos. 1, 2).  White Hall Pharmacy then filed an emergency motion for temporary restraining order (Dkt. No. 16).  On June 5, 2019, the Court held a telephonic hearing with the parties on the emergency motion for temporary restraining order, and on June 10, 2019, the Court entered an order denying the emergency motion for temporary restraining order (Dkt. No. 26). The Court then held an evidentiary hearing on the emergency motion for preliminary injunction on June 14, 2019 (Dkt. Nos. 32, 33).  For the following reasons, the Court now grants in part White Hall Pharmacy's emergency motion for preliminary injunction (Dkt. No. 2).

## II.    Findings Of Fact

The following facts are taken from the affidavits and exhibits in the record and the testimony presented to the Court at the hearing on the emergency motion for preliminary injunction.

Lelan Stice testified at the preliminary injunction hearing, and his affidavit is part of the record.  Mr. Stice is the owner and chief operating officer of White Hall Pharmacy, which operates two pharmacies in the Pine Bluff, Arkansas, metropolitan area (Pl. Ex. 7, ¶ 2).[2]  White Hall Pharmacy has existed since 2009 and has continually operated always under the fictitious trade names "Doctor's Orders" or "Doctor's Orders Pharmacy." (*Id*., ¶ 3).  The second location was opened in May 2013 (Dkt. No. 33, at 9).  At no time since White Hall Pharmacy was formed has it held itself out to the public as "White Hall Pharmacy" or any derivative of that name (Pl. Ex. 7, ¶ 4).  Rather, the public only knows it as "Doctor's Orders" or "Doctor's Orders Pharmacy." (*Id*.).

---

[2] The exhibits entered into the record at the preliminary injunction hearing are cited as "Pl. Ex." and "Defs. Ex."

White Hall Pharmacy recorded the name "Doctor's Orders" with the Arkansas Secretary of State when it registered in 2009 (Pl. Ex. 7, ¶ 5). A screenshot of the Arkansas Secretary of State's website reflects this registration (Pl. Ex. 1). Its pharmacies are licensed with the Arkansas State Board of Pharmacy as "Doctor's Orders Pharmacy" and "Doctor's Orders Pharmacy #2." (Pl. Ex. 7, ¶ 6). White Hall Pharmacy is licensed with the Federal Drug Enforcement Agency ("DEA") under the name "Doctor's Orders Pharmacy." (*Id*., ¶ 7).

Mr. Stice testified that the name of the pharmacy and the logo it uses have "stayed virtually the same" since the first pharmacy opened (Dkt. No. 33, at 6). In its advertising, White Hall Pharmacy routinely uses a combination of the words "Doctor's," "Orders," "Pharmacy," "Rx," and "RX" and has continually used this advertising strategy since 2009 without any break in time (Pl. Ex. 7, ¶ 8). White Hall Pharmacy's logo and advertising use red font, a red logo, and a white backsplash (*Id*., ¶ 9). A screenshot of a website attached to the complaint shows the domain name "www.doctorsorderspharmacy.com" with a header that says "doctor's orders" in lower-case letters and "PHARMACY" in all upper-case letters (Pl. Ex. 2). Those words are written in red font with a white backsplash (*Id*.). Furthermore, next to the header is a logo that says "RX" with white and red coloring (*Id*.). The record evidence contains a photo of a vehicle with the same language, logo, and color scheme (Pl. Ex. 3). The record evidence also contains a photo of a building with the same language, logo, and color scheme (Pl. Ex. 4).

Mr. Stice avers that no other pharmacy in Arkansas uses a similar "Doctor's Orders" terminology (Pl. Ex. 7, ¶ 10). Mr. Stice stated that he believes confusion has arisen due to "the trade name, the colors of the logo, [and] the website . . . ." (Dkt. No. 33, at 25). Further, White Hall Pharmacy has filed for federal and state trademarks for its trade names in connection with pharmacy and medicinal operations (Pl. Ex. 7, ¶ 27; Pl. Ex. 13).

Mr. Stice testified that he has "spent quite a bit of time joining community service organizations" in the Pine Bluff area (Dkt. No. 33, at 6). Mr. Stice is also a member of the Arkansas Pharmacy Association and the Arkansas Association of Health System Pharmacists (*Id*., at 8). White Hall Pharmacy sponsors community events in the Pine Bluff area, including the "Go Forward Fest" and the "King Cotton Classic." (*Id*., at 9-10). Mr. Stice testified that White Hall Pharmacy advertises on billboards (*Id*., at 10). White Hall Pharmacy has a website and a mobile application, according to Mr. Stice (Dkt. No. 33, at 10). Mr. Stice further testified that White Hall Pharmacy "pushe[s] ads to the entire state of Arkansas on Facebook" and that its "web page reaches worldwide." (*Id*.). Mr. Stice also worked with the Arkansas General Assembly and the Arkansas Pharmacy Association regarding "prescription benefit managers." (*Id*.). White Hall Pharmacy's Facebook page was used in that effort (*Id*., at 11). Mr. Stice testified that the website has "over 40,000 hits, 45,000 plus hits on one single ad that went out" and that other ads hit 25,000 to 28,000. (Dkt. No. 33, at 11).

Mr. Stice is not a member of the Lions Club or Rotary Club in Hot Springs nor does he advertise in a local paper in Hot Springs (*Id*., at 27). Mr. Stice also conceded that he does not recall any sponsorship requests arising from Hot Springs (*Id*., at 28).

Mr. Stice testified that White Hall Pharmacy has approximately 12,000 total patients (*Id*., at 21). He further testified that White Hall Pharmacy "fill[s] prescriptions for patients all over the state [of Arkansas] . . . ." (Dkt. No. 33, at 11). He explained that White Hall Pharmacy mails prescriptions "outside of the state . . . ." (*Id*.). Mr. Stice noted that White Hall Pharmacy has sent prescriptions to "[a] little over 130 cities total" and that "[a]bout 12 of those are out-of-state cities." (*Id*.). He conceded that "[n]ot many" of his customers who live in Little Rock drive down to Pine Bluff to use his pharmacy (*Id*., at 22). Mr. Stice further testified that White Hall Pharmacy has

"about 20 to 30" customers who reside in the Hot Springs, Arkansas, area (*Id.*, at 12). He stated that some of these customers are "mail order," while others "drive back and forth." (*Id.*, at 22). He also stated that White Hall Pharmacy has approximately 150 customers who have second homes in the Hot Springs area (Dkt. No. 33, at 12). Of the approximately 20 to 30 customers who currently live in Hot Springs, Mr. Stice testified that "[p]robably five" of them lived in Hot Springs when they began using White Hall Pharmacy (*Id.*, at 29). Mr. Stice conceded that, from his records, he could obtain the number of customers White Hall Pharmacy has outside of Jefferson County, Arkansas (*Id.*, at 22).

Mr. Stice further asserts that White Hall Pharmacy learned that defendants are individually or jointly operating a medical marijuana dispensary in Garland County, Arkansas, using the name "Doctors Orders," "Doctor's Orders Pharmacy," and "Doctors Orders RX." (Pl. Ex. 7, ¶ 11). At the time this action was filed, defendants operated one of the only two medical marijuana dispensaries in Arkansas (*Id.*, ¶ 13). Mr. Stice stated that defendants' medical marijuana dispensary is "roughly one hour away from [his] business's pharmacies." (*Id.*, ¶ 14).

Once the dispensary opened, Mr. Stice "started seeing posts on Facebook asking . . . kind of are we involved in it, asking for directions to the store." (Dkt. No. 33, at 13). Mr. Stice then "put a post out that [White Hall Pharmacy is] in no way affiliated with the medical marijuana dispensary." (*Id.*). According to Mr. Stice, he posted on Facebook around "20 or 30 times" during the first day (*Id.*). Mr. Stice also explained that "we had people check in at the pharmacy, and we started getting phone calls." (*Id.*). Specifically, Mr. Stice stated that he received around 60 phone calls "[i]n the first few days" and that the pharmacies have received "probably closer to a hundred phone calls . . . since then." (Dkt. No. 33, at 14). Mr. Stice noted that his pharmacies normally receive "about a hundred phone calls per pharmacy" a day for the prescription business (*Id.*, at 23).

He did note that the phone calls relating to medical marijuana are "more time-consuming," and those calls end once the caller realizes that White Hall Pharmacy is not a medical marijuana dispensary (*Id.*, at 23-24).

Mr. Stice testified that one of his employees asked him if he was in the medical marijuana business (*Id.*). Mr. Stice is also the director of pharmacy at the Jefferson Regional Medical Center, and he notified the CEO, the CFO, the chief nursing officer, and the controller at the hospital that his pharmacy was not involved with the medical marijuana dispensary (Dkt. No. 33, at 15). Additionally, many of the employees at that hospital have asked Mr. Stice if he is involved with the dispensary. Mr. Stice testified that a city councilman also asked him if he was involved with the dispensary (*Id.*). Mr. Stice related an incident where a reporter asked him if he was involved with the dispensary, and he has been asked about the dispensary "multiple times" at the country club (*Id.*, at 16). Mr. Stice testified that his staff have told him that "three to four people" have shown up at his pharmacies trying to purchase marijuana (*Id.*). His banker, Mr. Lambert, also asked him about his affiliation with the dispensary (Dkt. No. 33, at 16).

Mr. Stice further testified that "every news station, local news station, contacted me, along with the *Arkansas Democrat-Gazette* and the *Pine Bluff Commercial*." (*Id.*, at 17). He has had inquiries about his affiliation with the dispensary from "multiple physicians in the community." (*Id.*). Also, at the Arkansas Pharmacists Association meeting he attended, he "was asked at almost every break by different people," including a couple from Louisiana, whether he was involved with the dispensary (*Id.*).

In addition, Mr. Stice explained that his concern is that "approximately half of my patients might be concerned with the moral aspects of marijuana and therefore thinking that I'm associated with the program . . . ." (Dkt. No. 33, at 13). He also testified that approximately "20 to 30 percent"

of his customers are professionals, including physicians, pharmacists, doctors, attorneys, and bankers (*Id.*, at 20). Mr. Stice noted about "at least 5 or 10 percent of that group" has inquired about his affiliation with the dispensary (*Id.*). Mr. Stice stated that "it would be difficult for us to know" if customers were transferring to other pharmacies due to confusion about his affiliation with defendants' medical marijuana dispensary (*Id.*, at 13). Mr. Stice also noted that he has not seen an immediate change in his revenues, though he notes that revenue in the pharmacy business is "delayed 60 to 90 days . . . ." (Dkt. No. 33, at 19). He also stated that "[n]o one said they were going to no longer use my pharmacy once I clarified the issue they wanted to know." (*Id.*, at 26).

Mr. Stice maintains that defendants' operation uses signs and advertising that contain red letters and a white backsplash similar in appearance to White Hall Pharmacy's signs and advertising (Pl. Ex. 7, ¶ 12). The record contains a photograph of a sign that reads: "DOCTOR'S ORDERS" in upper-case letters (Pl. Ex. 8). The letters of this sign are written in red, and the background of the sign is white (*Id.*). Additionally, a screenshot of Google Maps shows a picture of this same sign and the words "Doctor's Orders" located at 4897 Malvern Rd., Hot Springs, Arkansas (Pl. Ex. 9). A screenshot of a satellite image from Google Maps shows a pin with the phrase "Doctor's Orders" by the pin (*Id.*). The Google Maps screenshot includes a thumbnail image of the sign described in Plaintiff's Exhibit 8 (*Id.*).

The record evidence also contains screenshots from "www.drsordersrx.com," which includes the text "Doctor's Orders" and the address "4897 Malvern Ave Hot Springs, Arkansas 71901." (Pl. Ex. 18). The website includes a logo in the shape of the state of Arkansas in white, with the following script: "DOCTOR'S ORDERS." (*Id.*). The background of the website is dark green (*Id.*). The record evidence also contains screenshots from a website called "weedmaps.com." (Pl. Ex. 19). These screenshots show a miniature version of the same logo that

is found on "www.drsordersrx.com" and state that the address of the dispensary is "4897 Malvern Ave Hot Springs, Arkansas 71901." (*Id.*). The website also includes an "Introduction" that states:

> Doctor's Orders is the first medical marijuana dispensary to open in the State of Arkansas! We are located on Malvern Ave. in Hot Springs, AR. You will need your medical marijuana card to enter our facility. Our wait times are at a minimum and we are able to get our patients in and out quickly. We look forward to meeting new customers & seeing our returning customers in the days and weeks to come. We apologize for any inconvince [sic] in our first few days of operation. We are working diligently to make it feel less like a prison inside (thank you state of Arkansas). Come to Doctor's Orders and see our softer side :) We truly appreciate your business.

(*Id.*).

Mr. Sears has presented an affidavit to the Court (Defs. Ex. 1). In his affidavit, Mr. Sears states that he is the sole owner of "Doctor's Orders RX, Inc." and that he incorporated that entity with the Arkansas Secretary of State on May 26, 2017 (*Id.*, ¶¶ 1-2). He further states that, at the time he filed his incorporation papers on May 26, 2017, he had "never heard of Doctor's Orders Pharmacy." (*Id.*, ¶ 6). He applied with the Arkansas Marijuana Commission d/b/a Doctor's Orders RX, Inc., for a medical marijuana dispensary permit in Garland County, Arkansas, and his application was ultimately approved (*Id.*, ¶ 4). He states that his dispensary business actually opened for business on May 10, 2019 (*Id.*).

He admits that he did not know about Doctor's Orders Pharmacy prior to receiving a cease and desist letter on May 14, 2019 (*Id.*). Mr. Sears further avers that he had "no knowledge of marks, symbols, colors or other advertising material which might have been used by Doctor's Orders Pharmacy in Pine Bluff." (*Id.*, ¶ 7).

Mr. Sears also states that he has "not done any advertising of [his] business, Doctor's Orders RX, Inc. and ha[s] never used any marks, symbols, color combinations or other advertising material as described by Doctor's Orders Pharmacy in their complaint . . . ." (Defs. Ex. 1, ¶ 7). He

says that, as of the time of his filing, his business has been in operation less than three weeks and that he has "not done any type of advertising or business promotion which might lead the public to think [his] business has any connection or association with Doctor's Orders Pharmacy in Pine Bluff." (*Id.*, ¶ 8).

The record evidence includes multiple articles published on the internet discussing defendants' medical marijuana dispensary (Pl. Ex. 11). Some of the articles refer to the medical marijuana dispensary as "Doctors Orders RX." (*Id.*, at 1, 3, 6, 9, 12, 19). Alternatively, such articles also refer to the dispensary as "Doctor's Orders." (*Id.*, at 4, 7, 9 , 10, 15, 19).

White Hall Pharmacy also presents the affidavit of Jeremy Lambert, a customer of White Hall Pharmacy (Pl. Ex. 10). Mr. Lambert testified at the preliminary injunction hearing. Mr. Lambert avers that he learned that a medical marijuana dispensary named "Doctor's Orders" was open in Hot Springs, Arkansas (*Id.*, ¶ 5). He also saw a post on Facebook stating the same information (*Id.*). In his testimony, Mr. Lambert testified that he learned about the dispensary from a customer who was in his office, and he also explained that he told the customer he "would assume it's incorrect" that the dispensary was affiliated with Mr. Stice (Dkt. No. 33, at 40). He then confirmed that there was no affiliation with Mr. Stice (*Id.*). In his affidavit, Mr. Lambert avers that he was confused about the medical marijuana dispensary's affiliation with White Hall Pharmacy (*Id.*, ¶ 6). Mr. Lambert testified that he was asked about the medical marijuana dispensary by three customers and "two to three employees" who worked with him (Dkt. No. 33, at 40). Mr. Lambert also avers that "5 other business owners and customers in Pine Bluff [have] ask[ed] me why Doctor's Orders Pharmacy would open a medical marijuana dispensary." (*Id.*, ¶ 8). Mr. Lambert claims that he "truly believe[s] this has damaged the reputation of [ ] Doctor's

Orders Pharmacy." (*Id.*). Mr. Lambert admits that he has not talked to people outside of Pine Bluff about this (Dkt. No. 33, at 42).

The record includes evidence that White Hall Pharmacy has been contacted regarding medicinal marijuana. A text message was sent to Mr. Stice in which the sender stated: "I am trying to get information on possible job openings. I have over 25 years['] experience and I am taking online classes at cannabis training university for my masters. I would love the opportunity." (Pl. Ex. 14).

The record also contains the affidavit of Leigh Cockrum, a resident of Pine Bluff who has "known this pharmacy for many years," though she concedes that she is not a customer of White Hall Pharmacy (Pl. Ex. 15, ¶¶ 2, 5). Ms. Cockrum avers that she learned that a medical marijuana dispensary named "Doctor's Orders" was opening in Hot Springs, Arkansas, and that she was confused about its affiliation with Mr. Stice (*Id.*, ¶¶ 5-6). Ms. Cockrum further avers that she "was surprised to hear that Lelan Stice was going to sell marijuana in Hot Springs." (*Id.*, ¶ 7). She stated that "[i]t was a common belief in Pine Bluff that this dispensary was somehow affiliated with White[]Hall Pharmacy or Lelan Stice . . . ." (*Id.*, ¶ 9). Finally, she states that "[m]any people in central Arkansas still believe that Whitehall Pharmacy or Lelan Stice is affiliated with the medi[c]al marijuana dispensary." (*Id.*, ¶ 10).

The affidavit of Aaron Spencer, an employee of White Hall Pharmacy, is also a part of the record evidence. He avers that, since defendants' medical marijuana dispensary opened, he has "received a large volume of calls at work from individuals asking about purchasing marijuana." (Pl. Ex. 16, ¶ 6). He states that one individual "asked if he and his friend could camp outside of our business in order to be one of the first individuals to purchase marijuana the next day." (*Id.*, ¶ 7). He also states that, "[f]or a while after the dispensary opened, I fielded on average 8 to 9 calls

a day from individuals who wished to purchase marijuana." (*Id.*, ¶ 8). He further states that "[w]ithin the past week, I had a phone conversation at work with one individual who called our pharmacy and wanted to purchase marijuana." (*Id.*, ¶ 9). Additionally, many of White Hall Pharmacy's regular customers have asked if White Hall Pharmacy is "affiliate[d] with the marijuana dispensary," as have members of Mr. Spencer's church (Pl. Ex. 16, ¶¶ 10, 11).

The affidavit of Win Trafford is also a part of the record evidence (Pl. Ex. 17). Mr. Trafford states that he is a customer of White Hall Pharmacy and that he was confused about the affiliation between defendants' medical marijuana dispensary and White Hall Pharmacy (*Id.*, ¶¶ 3, 7). He also states that "[i]t was common belief in Pine Bluff that this dispensary was somehow affiliated with White[]Hall Pharmacy." (*Id.*, ¶ 10). He further avers that he has "had many people in central Arkansas casually ask me about [Mr. Stice's] involvement in the Hot Springs dispensary." (*Id.*, ¶ 11).

Donna Ansley testified at the preliminary injunction hearing. She has known the Stices for the last 20 years and has had several family members use White Hall Pharmacy's services (Dkt. No. 33, at 31). Ms. Ansley lives in Benton, Arkansas (*Id.*, at 30). She testified that she learned about the medical marijuana dispensary through the morning news and that she initially thought Mr. Stice was affiliated with it (*Id.*, at 32). She testified that she was confused by the name of the dispensary (*Id.*). Ms. Ansley also testified about the reach of White Hall Pharmacy; she noted that her sister, who lives in Rison, Arkansas, uses White Hall Pharmacy's services (Dkt. No. 33, at 32). Ms. Ansley explained that she continues to use, and has not quit using, White Hall Pharmacy's services (*Id.*, at 34).

Sarah Stevenson testified at the preliminary injunction hearing. She works at White Hall Pharmacy's White Hall, Arkansas, location (*Id.*, at 35). She testified that, while working there,

she received phone calls from individuals looking to purchase medical marijuana (*Id*., at 36). She testified that the phone calls would end once she told the callers that White Hall Pharmacy does not offer medicinal marijuana (*Id*.). She stated that she "got about half a dozen [calls] that day that I worked the first week." (Dkt. No. 33, at 36). She also stated that, on a certain day, she believes that her store received "probably at least a dozen" phone calls like this (*Id*., at 37). She testified that, in the days that followed, White Hall Pharmacy continued to receive phone calls "[j]ust not as many." (*Id*.). She further testified that, while she personally has not encountered someone coming to White Hall Pharmacy to purchase marijuana, she has "heard that they have." (*Id*.). She did note that a former employee came to White Hall Pharmacy and asked "if we were associated with the marijuana . . . ." (Dkt. No. 33, at 38).

Mr. Stice further states that White Hall Pharmacy is prevented by federal regulations from possessing or dispensing Schedule I drugs (Pl. Ex. 7, ¶ 21). Mr. Stice testified that marijuana is a Schedule I drug and that there is potential for the DEA "to want to do an investigation to see if a DEA registrant is involved in the sale or processing of Schedule 1 substances." (Dkt. No. 33, at 19-20).

White Hall Pharmacy sent a letter to defendants on May 13, 2019, demanding that defendants cease and desist operating under the names "Doctors Orders Rx Inc." or "Doctors Orders Pharmacy." (Pl. Ex. 5). Mr. Sears and Doctor's Orders RX, Inc., responded *via* letter, arguing that Mr. Sears has a superior claim for the name "Doctor's Orders RX." (Pl. Ex. 6).

### III.    Subject Matter Jurisdiction

Defendants raise the issue of whether this Court has subject matter jurisdiction (Dkt. No. 29, at 3-4). Defendants contend that "neither party is engaged in interstate commerce, a vital test required for relief under the Lanham Act." (*Id*.). White Hall Pharmacy responds to this argument

and maintains that both White Hall Pharmacy and defendants are engaged in commerce that crosses state lines, thereby establishing this Court's subject matter jurisdiction (Dkt. No. 35, at 24-25).

At this stage of the litigation, the Court is satisfied that it has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338; further, the Court has supplemental jurisdiction over White Hall Pharmacy's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy. White Hall Pharmacy brings five claims against defendants: (1) false or misleading advertising in violation of the Lanham Act 15 U.S.C. § 1125(a); (2) false or misleading endorsements in violation of 15 U.S.C. § 1125(a); (3) misappropriation of trademark; (4) tortious interference with business expectancy; and (5) unjust enrichment (Dkt. No. 1, ¶¶ 34-122). The Supreme Court has determined that Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under [section] 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under [section] 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citations omitted).

The Court determines that the interstate commerce requirement—which 15 U.S.C. § 1125(a) incorporates—is met here. The Lanham Act defines interstate commerce as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. The Tenth Circuit Court of Appeals has held that "the jurisdiction of the Lanham Act constitutionally extends to unauthorized uses of trademarks on the Internet." *Utah Lighthouse Ministry v. Found. for Apologetic Information and Research*, 527 F.3d 1045, 1054 (10th Cir. 2008). Other courts have determined the same; "[i]n the computer and Internet context, courts have consistently held that

13

providing information over the Internet satisfies the commerce requirement of the Lanham Act." *Savannah College of Art and Design, Inc. v. Houeix*, 369 F. Supp. 2d 929, 942 (S.D. Ohio 2004) (quoting *Cable News Network, L.P., L.L.L.P. v. CNNews.com*, 177 F. Supp. 2d 506, 517-18 n.25 (E.D. Va. 2001)).

In *Planned Parenthood Federation of America, Inc. v. Bucci*, Case No. 97 Civ. 0629, 1997 WL 133313, at *3 (S.D.N.Y. Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998), the district court concluded that the Lanham Act's jurisdictional requirement was met because "defendant's actions affect plaintiff's ability to offer plaintiff's services, which, as health and information services offered in forty-eight states and over the Internet, are surely 'in commerce.'" Second, the court held that "even assuming, *arguendo*, that defendant's activities are not in interstate commerce for Lanham Act purposes, the effect of those activities on *plaintiff's* interstate commerce activities would place defendant within the reach of the Lanham Act." *Id*. Third, the court held that "establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement." *Id*.

Here, there is record evidence that both White Hall Pharmacy and defendants maintain an internet presence. Further, the record evidence demonstrates that White Hall Pharmacy fills prescriptions for residents of other states, shipping those prescriptions to customers, and relies on the national banking system to conduct its work. In addition, White Hall Pharmacy points out that defendants' marketplace is set by law and defined to include consumers from states other than Arkansas. *See* Ark. Admin. Code 007.16.4-IV(D)(1) ("A visiting qualifying patient may obtain marijuana from a dispensary upon producing evidence of his or her registry identification card or its equivalent that is issued under the laws of another state, district, territory, commonwealth, or

insular possession of the United States."). For these reasons, at this stage of the litigation, the Court concludes it has subject matter jurisdiction over White Hall Pharmacy's claims.

## IV. Standard

When determining whether to grant a motion for a preliminary injunction, this Court considers the same factors as the Court considered when evaluating the request for a temporary restraining order: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (citing *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109, 114 (8th Cir. 1981)). Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* In deciding whether to grant preliminary injunctive relief or a temporary restraining order, likelihood of success on the merits is most significant. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012). The "ordinary preliminary injunction test" applies here, and it "asks only whether a movant has demonstrated a 'fair chance of prevailing' in the ultimate litigation . . . ." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Bierman v. Dayton*, 817 F.3d 1070, 1072 (8th Cir. 2006) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). But "[o]ther courts have

15

granted preliminary relief without regard to establishing the status quo, as long as there was a showing of potential irreparable harm, and at other times, as long as the injunction creates a common sense modus vivendi . . . ." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984) (quoting *Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966)).

## V. Emergency Motion For Preliminary Injunction

White Hall Pharmacy brings five claims against defendants: (1) false or misleading advertising in violation of the Lanham Act 15 U.S.C. § 1125(a); (2) false or misleading endorsements in violation of 15 U.S.C. § 1125(a); (3) misappropriation of trademark; (4) tortious interference with business expectancy; and (5) unjust enrichment (Dkt. No. 1, ¶¶ 34-122). For relief, White Hall Pharmacy asks for injunctive relief, special damages, attorneys fees, and pre- and post-judgment interest.

In its motion for an emergency preliminary injunction White Hall Pharmacy asks this Court for a preliminary injunction that "requires Defendants to immediately cease using Plaintiff's name, terms, and symbols in public business operations or advertising . . . ." (Dkt. No. 2, ¶ 14). In its most recent filing, White Hall Pharmacy admittedly narrows the relief it seeks and "requests that the Court order Defendants to immediately cease holding themselves out under the 'Doctor's Orders' moniker to the public within the State of Arkansas." (Dkt. No. 35, at 24). This would include a prohibition on any signage and advertising that can be viewed by consumers within the State of Arkansas. White Hall Pharmacy maintains that defendants may "use a red and white backsplash and the 'Rx' symbol in association" with a new name "so long as the words 'Doctor's Orders' or any combination thereof do not appear on any material they present to the public." (*Id.*). For the reasons discussed below, the Court grants in part White Hall Pharmacy's emergency motion for preliminary injunction.

### A.    Likelihood Of Success On The Merits

The Court will first analyze each claim to determine if White Hall Pharmacy has established a fair chance of prevailing on the merits of any of its claims.

### 1.    False Advertising Claim Under § 1125(a)(1)(B)

The Court concludes, upon the record before it, that White Hall Pharmacy has failed to demonstrate that it has a fair chance to prevail on its false advertising claim under § 1125(a)(1)(B). Section 1125(a)(1)(B) creates a cause of action against those who use a false or misleading description or representation of fact which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her . . . goods, services, or commercial activities . . . ." 15 U.S.C. 1125(a)(1)(B).  To establish a Lanham Act false advertising claim, a plaintiff must prove "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Buetow v. A.L.S. Enter., Inc.*, 650 F.3d 1178, 1182 (8th Cir. 2011) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)).

In its post-hearing briefing, White Hall Pharmacy notes that it alleges that defendants' advertising is misleading rather than false under the Lanham Act (Dkt. No. 35, at 13).  White Hall Pharmacy argues that defendants have engaged in five types of misleading advertisements:  (1) the sign outside of defendants' dispensary; (2) the creation of a location on Google Maps; (3) interviews with local media about defendants' location and services; (4) the creation of a website

that provides defendants' customers with information about defendants' dispensary; and (5) the inclusion of defendants' dispensary on the third-party website, "Weedmaps." (*Id*.). White Hall Pharmacy also argues that Mr. Sears' affidavit is the only evidence that defendants have not engaged in advertising and that the Court should disregard that affidavit given that the record evidence shows that defendants have engaged in advertising (*Id*., at 14). Defendants argue that White Hall Pharmacy is not entitled to relief under the Lanham Act because it is not engaged in interstate commerce (Dkt. No. 29, at 3). Specifically, defendants argue that it is illegal for them to ship products through the mail or by any other mode of delivery and that "[a]ny business they might do with out-of-state residents is likely insignificant." (*Id*.).

Based upon the record evidence currently before the Court, the Court concludes that White Hall Pharmacy has failed to demonstrate that it has a fair chance to prevail on the merits of its false advertising claim. White Hall Pharmacy's false advertising claim is based upon the theory that the alleged advertising may be literally true or ambiguous but implicitly conveys a false impression, is misleading in context, or is likely to deceive consumers. *United Indus.*, 140 F.3d at 1180. With this type of claim, "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." *Id.* (citing *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (per curiam); *Johnson & Johnson—Merck Consumer Pharm. Co. v. SmithKlineBeecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992)). This type of claim "usually turns on the persuasiveness of a consumer survey." *Id.* (quoting *Johnson & Johnson—Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 129-30 (3rd Cir. 1994)). "Unless a commercial claim is literally false, or a trier of fact has determined that a competitor acted willfully with intent to deceive or in bad faith, a party seeking relief under this section of the Lanham Act bears the

ultimate burden of proving actual deception by using reliable consumer or market research."

*United Indus.*, 140 F.3d at 1183 (citing *Smithkline Beecham,* 960 F.2d at 297 ("It is not for the judge to determine, based solely upon his or her intuitive reaction, whether the advertisement is deceptive."); *AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1443 (3rd Cir. 1994) (quoting *Sandoz Pharmaceuticals Corp. v. Richardson—Vicks, Inc.*, 902 F.2d 222, 228–29 (3rd Cir. 1990) ("[I]t cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually* do react.")).

This Court acknowledges that, "[a]t the preliminary injunction stage, however, full-blown consumer surveys or market research are not an absolute prerequisite, and expert testimony or other evidence may at times be sufficient to obtain preliminary injunctive relief in cases involving implicitly false or misleading claims." *United Indus.*, 140 F.3d at 1183 (citing *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 15 (7th Cir. 1992); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:55 (5th ed.) ("However, on a motion for a preliminary injunction, a survey is not always necessary and it is sufficient if plaintiff introduces expert testimony or any other evidence showing that a significant number of consumers received the claimed message from the advertisement.")). White Hall Pharmacy's position is unsupported at this point by expert testimony or surveys. White Hall Pharmacy does, however, present some evidence of consumer reaction.

A Lanham Act plaintiff pursuing this type of claim must also prove that, even if deception exists, the deception is likely to influence consumers' purchasing decisions. *United Indus.*, 140 F.3d at 1180; *see 3M Innovative Props Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 971 (D. Minn. 2005) ("Materiality . . . considers whether the false or misleading statement is likely to make a difference to purchasers." (internal quotation omitted)). Here, Mr. Lambert avers that

he believes that defendants' dispensary has "damaged the reputation" of White Hall Pharmacy. While there is record evidence that certain individuals have been confused about the relationship between White Hall Pharmacy and defendants, there is insufficient record evidence that such confusion is likely to influence consumers' purchasing decisions. There is no record proof that defendants offer traditional pharmacy services, and there is no record proof that White Hall Pharmacy offers medical marijuana for sale. In fact, defendants maintain that they only dispense medical marijuana and that their ability to do so is solely a product of Arkansas state law (Dkt. No. 29, at 3). White Hall Pharmacy presents record evidence that it "is prevented by federal regulations from possessing or dispensing Schedule I drugs," which include marijuana (Pl. Ex. 7, ¶ 23; Dkt. No. 3, at 4 (citing 21 C.F.R. §§ 1301.13(e)(1), 1301.11(a))). Even if the Court assumes for purposes of resolving this motion only that the parties' businesses overlap to some extent, there is no evidence that this confusion has influenced those consumers' ultimate purchasing decisions.

The Court is left with the argument that consumer preferences may have been affected because White Hall Pharmacy's preexisting customers may prefer other pharmacies due to a mistaken association between White Hall Pharmacy and defendants' marijuana dispensary. First, there is no record evidence that White Hall Pharmacy's pre-existing or potential customers are electing to use other pharmacies due to defendants' allegedly false advertisements. Mr. Stice conceded that his revenues are delayed by 60 to 90 days, so any discernible effect will also be delayed. Mr. Lambert's testimony that White Hall Pharmacy's reputation has been harmed is insufficient, by itself, to demonstrate that consumer purchasing decisions have been or are likely to be influenced. The Court is sympathetic to the fact that it may be difficult for White Hall Pharmacy to prove any immediate financial impact as a result of defendants' alleged false

advertising, yet it appears to the Court that such an impact—if it exists—may become apparent as discovery proceeds in this case.

White Hall Pharmacy asks the Court "to recognize that marijuana use and distribution are, at the very least highly controversial subjects." (Dkt. No. 35, at 6). Yet, by White Hall Pharmacy's own admission, 48% of Arkansans voted against the Arkansas Medical Marijuana Amendment in 2016 (*Id.*)—meaning 51% of Arkansas voters voted for the Amendment. As a result, even if the Court were to recognize these facts, it is unclear on this record how the Court should weigh them. While White Hall Pharmacy argues a negative association with this issue, defendants argue a positive association with this issue (Dkt. No. 19, at 3).

Finally, the Court notes that much of White Hall Pharmacy's false advertising claim revolves around the question of whether defendants' representations suggest a connection between defendants and White Hall Pharmacy. While the Eighth Circuit Court of Appeals has not addressed whether such claims are more appropriately brought as false association claims, other circuit courts have held that such claims are more appropriately raised in a false association claim under the Lanham Act. *See Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 227-230 (3d Cir. 2017) (holding that a false advertising claim was "nothing more" than a false association claim where the primary argument in favor of the false advertising claim was that "the name PARKS FINEST falsely implies that Tyson's product is one of Parks's products."); *see also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:12 (5th ed.).

For the reasons discussed above, the Court concludes that White Hall Pharmacy has not demonstrated on the limited record before the Court that it has a fair chance to prevail upon the merits of its false advertising claim.

## 2.      Misappropriation Of Trademark Claim

White Hall Pharmacy's complaint alleges a claim of "misappropriation of trademark." At the hearing on June 5, 2019, counsel for White Hall Pharmacy clarified that it is not bringing a trademark infringement claim under the Lanham Act; thus, White Hall Pharmacy's claim is one for common law trademark infringement. At the outset, the Court notes that the elements of a false association trademark claim under the Lanham Act essentially track the elements of a common law trademark infringement claim. *Parks*, 863 F.3d at 230 (reciting the elements). The Court will rely upon federal precedent to determine whether White Hall Pharmacy's alleged trademark was infringed upon. *See First Bank v. First Bank System, Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996); *Jim Venable Co., Inc. v. DelValle*, Case No. 4:11-cv-639-DPM, 2011 WL 5869764, at *3 (E.D. Ark. Nov. 22, 2011); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1.50 (5th ed.) (noting that "most state courts will rely upon federal precedent when determining if there is trademark infringement under state statutory or common law.").

In asserting the exclusive right to use "Doctor's Orders," "Doctor's Orders Pharmacy," and "Rx" when used in conjunction with "Doctor's Orders" with respect to all others who perform the same or similar services in Arkansas since 2009, White Hall Pharmacy has not claimed that it possesses a registered trademark; therefore, it must rely upon the existence of a common-law trademark in bringing this lawsuit. *First Bank*, 84 F.3d at 1044. Moreover, since White Hall Pharmacy claims exclusive use of these phrases, it must prove that it had a common-law trademark to those phrases prior to defendants' use of "Doctors Orders," "Doctor's Orders Pharmacy," and "Doctors Orders RX." White Hall Pharmacy must also prove that it has had exclusive and prior use of those phrases within its market area and that defendants' alleged misappropriation occurred in that market area.

The Court acknowledges the *Tea Rose/Rectanus* doctrine. *Nat'l Ass'n for Healthcare Communications, Inc. v. Central Ark. Area Agency on Aging, Inc.*, 257 F.3d 732, 735 (8th Cir. 2001) (examining the doctrine as applied to a dispute involving common law marks). The doctrine provides that "the first user of a common law trademark may not oust a later user's good faith use of an infringing mark in a market where the first user's products or services are not sold." *Id.* The rationale for the doctrine is that "the owner of a mark may not 'monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another.'" *Id.* (quoting *Hanover Star Milling, Co. v. Metcalf*, 240 U.S. 403, 415 (1916)).

The Court concludes that there is no evidence of bad faith on the part of defendants. Defendants took steps to license, and opened for business, their dispensary before receiving White Hall Pharmacy's cease and desist letter. Accordingly, White Hall Pharmacy can only prohibit the use of "Doctor's Orders," "Doctor's Orders Pharmacy," and "Rx" when used in conjunction with "Doctor's Orders" in its market area if White Hall Pharmacy can prove that: (1) it had a common-law trademark in those phrases prior to defendants' allegedly infringing use of similar marks; and (2) its common-law mark is similar enough to defendants' mark to create a substantial likelihood of confusion among consumers. *First Bank*, 84 F.3d at 1044 (citation omitted).

### i.        Are White Hall Pharmacy's Marks Protectible?

First, the Court must determine whether White Hall Pharmacy has a fair chance of prevailing on its argument that it has a protectible mark in the phrases "Doctor's Orders," "Doctor's Orders Pharmacy," and "Rx" when used in conjunction with "Doctor's Orders." To determine whether White Hall Pharmacy's alleged marks are protectible, the Court must first categorize the marks. "A term for which trademark protection is claimed will fall in one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." *Frosty Treats*

23

*Inc. v. Sony Computer Entertainment Am. Inc.*, 426 F.3d 1001, 1004 (8th Cir. 2005) (quoting *WSM,*

*Inc. v. Hilton*, 724 F.2d 1320, 1325 (8th Cir. 1984)).  "A generic mark refers to the common name

or nature of an article, and is therefore not entitled to trademark protection."  *Frosty Treats Inc.*,

426 F.3d at 1005 (citing *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324,

1329 (8th Cir. 1985)).  "A term is descriptive if it conveys an immediate idea of the ingredients,

qualities or characteristics of the goods . . . and is only protectible if shown to have acquired a

secondary meaning."  *Frosty Treats Inc.*, 426 F.3d at 1005 (citing *Co-Rect Prods.*, 780 F.2d at

1329) (internal quotation and citation omitted).  "Suggestive marks, which require imagination,

thought, and perception to reach a conclusion as to the nature of the goods, and arbitrary or fanciful

marks, are entitled to protection regardless of whether they have acquired secondary meaning."

*Frosty Treats Inc.*, 426 F.3d at 1005 (citing *Co-Rect Prods.*, 780 F.2d at 1329).

Based upon the record evidence, the Court concludes that plaintiff has a fair chance of

prevailing on its argument that the phrases "Doctor's Orders," "Doctor's Orders Pharmacy," and

"Rx" when used in conjunction with "Doctor's Orders" are descriptive.  "Doctor's Orders" or

"Doctor's Orders Pharmacy" conveys an immediate idea of the qualities and characteristics of the

goods and services that are being provided by White Hall Pharmacy.  *See Frosty Treats Inc.*, 426

F.3d at 1005 (finding that the phrase "Frosty Treats" is descriptive).

Next, White Hall Pharmacy must demonstrate that it has a fair chance of prevailing on its

argument that the phrases "Doctor's Orders," "Doctor's Orders Pharmacy," and "Rx" when used

in conjunction with "Doctor's Orders" have acquired a "secondary meaning" within White Hall

Pharmacy's market area.  "Secondary meaning is an association in the minds of consumers

between the mark and the source or origin of the product."  *Id.* (quoting *Co-Rect Prods.*, 780 F.2d

at 1329).  Secondary meaning requires that "the public recognize the mark and associate it with a

single source." *Id*. "A trademark user establishes secondary meaning by showing that through 'long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others.'" *Furminator, Inc. v. Ontel Prods. Corp.*, 429 F. Supp. 2d 1153, 1176 (E.D. Mo. 2006) (quoting *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994)). "[D]irect evidence such as consumer testimony or surveys are most probative of secondary meaning." *Frosty Treats*, 426 F.3d at 1005. "Circumstantial evidence such as the exclusivity, length and manner of the use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying could also establish secondary meaning." *Id*. at 1005-06. "The ultimate inquiry on secondary meaning is whether, in the consumer's mind, the mark denotes a single thing coming from a single source:  it is the perception of the term by the consumer that matters." *Furminator, Inc.*, 429 F. Supp. 2d at 1177 (citing *Co-Rect Prods.*, 780 F.2d at 1332-33). "Without such a showing of secondary meaning for a descriptive term, there can be no likelihood of confusion, and no trademark infringement." *Id*.

The record evidence before the Court is that White Hall Pharmacy has existed since early 2009 and has always used the fictitious trade names "Doctor's Orders" or "Doctor's Orders Pharmacy." (Pl. Ex. 7 , ¶ 3). Furthermore, in its advertising, White Hall Pharmacy "routinely uses a combination of the words 'Doctor's,' 'Orders,' 'Pharmacy,' 'Rx,' and 'RX' and has continually used this advertising strategy since 2009 without any break in time." (*Id*., ¶ 8). The record evidence also indicates that White Hall Pharmacy's logo and advertising use a red font, red logo, and white backsplash (*Id*., ¶ 9; Dkt. No. 16-3). The record evidence is that "[n]o other pharmacy in Arkansas uses a similar 'Doctor's Orders' terminology." (Pl. Ex. 7, ¶ 10).  Mr. Stice testified that the name

of the pharmacy and its logo have "stayed virtually the same" since he opened the first pharmacy (Dkt. No. 33, at 6).

Since defendants began operating their medical marijuana dispensary, Mr. Stice asserts that White Hall Pharmacy has been "inundated with calls from individuals who are either seeking marijuana or requesting information about the marijuana dispensary," and Mr. Stice further asserts that he has received many inquiries about whether he was involved in the medical marijuana business (Pl. Ex. 7, ¶¶ 16-17). The record also contains evidence that multiple individuals immediately thought of White Hall Pharmacy when they heard the name of defendants' dispensary. Although this record evidence is not overwhelming, White Hall Pharmacy has presented evidence that leads this Court to determine that White Hall Pharmacy has a fair chance to prevail on its argument that, due to its efforts and exclusive use, the phrases "Doctor's Orders," "Doctor's Orders Pharmacy," and "Rx" when used in conjunction with "Doctor's Orders" acquired secondary meaning by May 2019, at least for certain customers in certain markets.

### ii. Priority Of Use

The undisputed record evidence before the Court is that White Hall Pharmacy has "routinely use[d] a combination of the words 'Doctor's,' 'Orders,' 'Pharmacy,' 'Rx,' and 'RX' and has continually used this advertising strategy since 2009 without any break in time." (Pl. Ex. 7, ¶ 8). There is no record evidence that defendants' use of allegedly similar marks predates White Hall Pharmacy's use of those marks. Instead, the record evidence is that Mr. Sears incorporated Doctor's Orders RX, Inc., in 2017, filed an application with the Arkansas Marijuana Commission in that name in late 2017, had his application approved on or about February 13, 2019, and opened the dispensary for business on May 10, 2019 (Defs.' Ex. 1, ¶¶ 3-4). Accordingly, based upon the record evidence, the Court finds that White Hall Pharmacy has a fair chance of prevailing on its

argument that it has priority over defendants for the use of the phrases "Doctor's Orders," "Doctor's Orders Pharmacy," and "Rx" when used in conjunction with "Doctor's Orders" within White Hall Pharmacy's market area.

### iii.    Market Area

The Court next turns to the question of White Hall Pharmacy's market area. The scope of White Hall Pharmacy's market area determines the geographic extent to which its marks are protectible. *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 928 (8th Cir. 1967) ("Plaintiff's prior use of a trademark within a given market area entitles it to exclusive use of that mark within that area . . . ."). White Hall Pharmacy argues that its market "includes the entire State of Arkansas and then some." (Dkt. No. 35, at 8). White Hall Pharmacy also urges the Court to find that defendants' geographic market includes the entire state of Arkansas (*Id.*). Further, White Hall Pharmacy argues that defendants' business "is too similar to Plaintiff's business to simply ignore." (*Id.*, at 9). Defendants, on the other hand, argue that White Hall Pharmacy's "market area is limited to the immediate vicinity of Pine Bluff and d[oes] not extend to Garland County in any significant way . . . ." (Dkt. No. 34, at 5).

First, based upon the record evidence before the Court at this stage of the proceedings, the Court concludes that White Hall Pharmacy has a fair chance of demonstrating that the parties offer competing services and products, at least to some extent. While it appears to be true that consumers may not buy defendants' products at White Hall Pharmacy's locations and that consumers cannot buy White Hall Pharmacy's products at defendants' dispensary, the Court acknowledges that defendants' dispensary operates under the Arkansas *Medical* Marijuana Amendment of 2016. Ark. Const. Amend. 98 (emphasis added). Furthermore, defendants' dispensary is held out to the public under the name "Doctor's Orders," which at least suggests that

27

defendants' dispensary offers medical services. Thus, there is record evidence that both parties ostensibly offer medicinal services and products to the public. *See Sweetarts*, 380 F.2d at 927 ("We do not believe the candy purchasing public who might be exposed to both plaintiff's and defendants' candy can escape the confusion. A person who sees defendants' 5 cent tart tablet for 'kids' marked 'SweeTarts' will naturally believe that plaintiff's butter toffees and assorted chocolates, also marked 'SweeTarts,' come from a common source."). Accordingly, the Court concludes that White Hall Pharmacy has a fair chance of demonstrating that the parties' services and products do overlap to some extent.

The Court concludes, however, that White Hall Pharmacy does not have a fair chance of prevailing on the question of whether its market overlaps with defendants' market outside of the Pine Bluff area based on the current record evidence before the Court. To determine which areas are within the parties' markets, the Court "should weigh all the factors including plaintiff's dollar value of sales at the time defendants entered the market, number of customers compared to the population of the state, relative and potential growth of sales, and length of time since significant sales." *Sweetarts*, 380 F.2d at 929. To be entitled to protection, White Hall Pharmacy's market penetration "must be significant enough to pose the real likelihood of confusion among the consumers in that area between the products of [White Hall Pharmacy] and the products of defendants." *Id.* (internal citations omitted). "Where the first user's activities in a remote area are 'so small, sporadic, and inconsequential' that its market penetration is *de minimus*, the first user is not entitled to protection against a later user's good faith adoption of the mark in that area." *Nat'l Ass'n for Healthcare Communications*, 257 F.3d at 736 (quoting *Sweetarts*, 380 F.2d at 929). Additionally, "advertising alone is not sufficient to satisfy the significant market penetration test

of *Sweetarts . . . .*" *Nat'l Ass'n for Healthcare Communications*, 257 F.3d at 736 (quoting *Flavor Corp. of Am. v. Kemin Indus., Inc.*, 493 F.2d 275, 284 (8th Cir. 1974)).

Here, the record evidence is that White Hall Pharmacy has approximately 12,000 total patients and that "about 20 to 30" of those customers reside in the Hot Springs, Arkansas, area (Dkt. No. 33, at 11-12). Mr. Stice also testified that White Hall Pharmacy has mailed prescriptions to over 130 cities, 12 of which are out-of-state cities (*Id.*, at 11). The record evidence also indicates that approximately 150 of White Hall Pharmacy's customers have second homes in the Hot Springs area (*Id.*, at 12). Furthermore, of the approximately 20 to 30 customers who reside in Hot Springs, Mr. Stice testified that "[p]robably five" of them lived in Hot Springs when they began using White Hall Pharmacy (*Id.*, at 29).

The record evidence also indicates that White Hall Pharmacy conducts advertising and has a website (Dkt. No. 33, at 10). Mr. Stice is a member of several civic organizations in Pine Bluff, Arkansas, and he is also involved in several statewide organizations (*Id.*, at 8-10). Mr. Stice also testified that White Hall Pharmacy "pushe[s] ads to the entire state of Arkansas on Facebook . . . ." (*Id.*, at 10). Mr. Stice is not a member of the Lions Club or Rotary Club in Hot Springs, Arkansas, nor does he advertise in a local paper in Hot Springs (*Id.*, at 27).

As for defendants, the record evidence is that their dispensary was one of two operating in Arkansas at the time of this filing (Pl. Ex. 7, ¶ 13). There is record evidence that defendants' dispensary location is identified on Google Maps, that a website exists with the hyperlink "www.drordersrx.com," and that defendants' dispensary is identified on a website called "weedmaps.com." (Pl. Exs. 18, 19). Mr. Sears avers that he has "not done any advertising of [his] business . . . ." (Defs. Ex. 1, ¶ 7).

In sum, the exact extent of each parties' market penetration outside of their immediate local markets remains unclear to the Court. The record evidence is that White Hall Pharmacy provides mail order prescriptions outside of the Pine Bluff area to over 130 cities, 12 of which are out-of-state cities, but the extent and destination of those sales is unclear. Further, while Mr. Stice is involved in local civil groups in the Pine Bluff area, he concedes that he is not similarly involved in civic groups based in Hot Springs. Additionally, while White Hall Pharmacy does have customers who live in Hot Springs, Mr. Stice admitted that only five of them lived in Hot Springs when they began using White Hall Pharmacy's services and that there are only approximately 20 to 30 who reside there now. Thus, the Court concludes that there is insufficient support in the record evidence for White Hall Pharmacy's contention that its market extends beyond the Pine Bluff area.

At the same time, while the record evidence indicates that defendants' dispensary was only one of two operating in Arkansas at the time of the events giving rise to this litigation, the record is silent about where the dispensary's customers originate. It is possible that those customers are primarily local to the Hot Springs area; the record is silent on this point. Based on the record evidence of actual confusion, which this Court examines elsewhere in this Order, the Court concludes, at least at this stage of the litigation, that more likely than not White Hall Pharmacy and defendants' dispensary both serve customers in the Pine Bluff area, especially given that, at the time this action was filed, defendants' dispensary was only one of two operating in Arkansas.

To the extent that White Hall Pharmacy argues that defendants' market area encompasses the entire state of Arkansas and other states because citizens of Arkansas and other states may be eligible to purchase medical marijuana from defendants' dispensary, this argument ignores the significant market penetration test set forth in *Sweetarts*. The significant market penetration test

focuses upon the extent to which a party has made inroads into a geographic market *via* sales, not advertising; the possibility of potential sales is not, by itself, sufficient to establish market penetration under *Sweetarts*. *See Nat'l Ass'n for Healthcare Communications, Inc.*, 257 F.3d at 736. Additionally, if the Court were to accept that the existence of potential customers defines the extent of defendants' market area, then defendants' market area would extend far beyond the borders of Arkansas. *See* Ark. Admin. Code 007.16.4-IV(D)(1) ("A visiting qualifying patient may obtain marijuana from a dispensary upon producing evidence of his or her registry identification card or its equivalent that is issued under the laws of another state, district, territory, commonwealth, or insular possession of the United States."). Adopting this argument would require the Court to conclude that defendants' market area encompasses much of the United States. Again, such a conclusion is not supported by the significant market penetration test set forth in *Sweetarts*.

In sum, the record evidence currently before the Court demonstrates that White Hall Pharmacy has maintained exclusive and prior use of its marks in the Pine Bluff area. The Court determines at this stage of the litigation that the evidence that White Hall Pharmacy has 20 to 30 customers in the Hot Springs area is insufficient to show that White Hall Pharmacy has more than *de minimus* sales in the Hot Springs area. Likewise, testimony that White Hall Pharmacy ships prescriptions to over 130 cities, 12 of which are out-of-state cities, does little to inform the Court of the reach and extent of White Hall Pharmacy's market penetration. The Court could be convinced otherwise by evidence of the volume and timing of such sales and location of the cities; such evidence is currently absent from the record. The Court must therefore conclude at least on the record evidence currently before it that White Hall Pharmacy has not demonstrated that it has a fair chance of prevailing on the question of whether it has exclusive and prior use of its marks in

the Hot Springs area or in the entire State of Arkansas, but it has demonstrated a fair chance of prevailing on the question of whether it has exclusive and prior use of its marks in the Pine Bluff area.

### iv.     Likelihood Of Confusion

If White Hall Pharmacy succeeds in showing that it has had exclusive and prior use of its marks in the markets utilized by defendants, the Court next examines whether a likelihood of confusion exists between White Hall Pharmacy's marks and the marks used by defendants.  For the following reasons, the Court concludes that, based upon the present record evidence, White Hall Pharmacy has demonstrated a fair chance of prevailing on the question of whether there is a likelihood of confusion between its marks and those used by defendants.

The Eighth Circuit applies a six-factor test to determine whether there is a likelihood of confusion, no part of which is dispositive standing alone:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and, (6) the type of product, its cost, and conditions of purchase.

*Sensient Technologies Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 763 (8th Cir. 2010) (quoting *Frosty Treats Inc.*, 426 F.3d at 1003).

To begin, the Court examines the strength of White Hall Pharmacy's marks.  "A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one."  *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).  Based upon the record evidence before the Court, the Court concludes that White Hall Pharmacy's marks, although protectible, are relatively weak.  The record evidence indicates that White Hall Pharmacy uses lower-case letters for "Doctor's Orders" and all upper-case letters for "Pharmacy" in its marks.  Furthermore, the record

evidence is that the font for these phrases is red with a white backsplash. While these marks are somewhat distinctive, the Court hesitates to describe them as strong marks. This factor weighs only slightly in favor of White Hall Pharmacy.

With respect to the second criterion, the similarity between the competing marks, the Court finds that White Hall Pharmacy and defendants' marks are similar. As just discussed, the record evidence is that White Hall Pharmacy's marks include the phrases "Doctor's Orders," "Doctor's Orders Pharmacy," and "Rx" when used in conjunction with "Doctor's Orders." Further, White Hall Pharmacy's signs, advertisements, and website use a mark that reads "doctor's orders PHARMACY" with red font and a white backsplash, accompanied by an "RX" symbol. The record evidence also shows that defendants are listed on Google Maps as "Doctor's Orders" and that defendants' advertisement reads "DOCTOR'S ORDERS" in red font with a white background. Based upon the record evidence, the Court concludes that White Hall Pharmacy has a fair chance of prevailing on its claim that its marks are similar to defendants' marks. This factor weighs in favor of White Hall Pharmacy.

Regarding the third factor for determining the likelihood of confusion, there is no record proof that defendants offer traditional pharmacy services, and there is no record proof that White Hall Pharmacy offers medical marijuana for sale. White Hall Pharmacy argues that its "competitive proximity" with defendants' dispensary should be considered when evaluating whether the parties offer competing services (Dkt. No. 35, at 9). In support, White Hall Pharmacy cites *Board of Trustees of University of Arkansas v. Professional Therapy Services, Inc.*, 873 F. Supp. 1280 (W.D. Ark. 1995), where a district court heard a trademark dispute brought by the Board of Trustees for the University of Arkansas (the "University") against Razorback Sports and Physical Therapy Clinic ("Clinic"). In that case, the district court found that the University and

the Clinic offered "related services" because both the University and the Clinic offered physical therapy services and athletic training services. *Bd. of Trustees of Univ. of Ark.*, 873 F. Supp. at 1290. The district court there noted that, "[e]ven if the University and the Clinic do not compete, there is no doubt that they offer related services." *Id.* Here, White Hall Pharmacy argues that, since medicinal marijuana is directed at medical ailments, medicinal marijuana and pharmaceutical services are related. It is unclear whether this is sufficient or as related as the services provided by the University and Clinic in *Board of Trustees of University of Arkansas*, 873 F. Supp. at 1290; however, as discussed above in relation to the question of White Hall Pharmacy's market area, the Court concludes that the parties' services and products do overlap to some extent. The Court therefore finds that this factor weighs in favor of White Hall Pharmacy.

As to the fourth factor, there is no evidence that defendants intend to pass off White Hall Pharmacy's marks as their own. The record evidence is that defendants applied for incorporation with the Arkansas Secretary of State and applied with the Arkansas Marijuana Commission as early as 2017 and that the dispensary opened for business on May 10, 2019 (Defs.' Ex. 1, ¶¶ 3-4). Further, record evidence suggests that defendants first became aware of White Hall Pharmacy's marks when they received a demand letter sent by White Hall Pharmacy's counsel on May 13, 2019 (Pl. Ex. 5). In response, defendants' counsel sent a letter arguing that defendants' marks were dissimilar to White Hall Pharmacy's marks and that, even if they were not, defendants had a superior claim to use those marks (Pl. Ex. 6). Given the lack of record evidence evincing an intent by defendants to misappropriate White Hall Pharmacy's marks, the Court concludes that White Hall Pharmacy has not shown that it has a fair chance of prevailing on this factor. This factor weighs against White Hall Pharmacy.

The Court finds that the "incidents of actual confusion" factor weighs in favor of and provides some support for White Hall Pharmacy's misappropriation of trademark claim. "[A]ctual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion." *SquirtCo.*, 628 F.2d at 1091 (citation omitted). Indeed, "[a]lthough evidence of actual confusion is not necessary for a finding that a likelihood of confusion exists, it is perhaps the most effective way to prove a likelihood of confusion." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999) (citations omitted).

The Eighth Circuit has, however, noted that "even several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Duluth News-Tribune, a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1099 (8th Cir. 1996) ("*Duluth News-Tribune*") (citations omitted). "Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:14 (5th ed.).

On this point, the undisputed record evidence confirms the following incidents:

- Mr. Stice avers that his "business has been inundated with calls from individuals who are either seeking marijuana or requesting information about the marijuana dispensary." (Pl. Ex. 7, ¶ 16).

- Mr. Stice avers that "[b]eginning with the announcement of the Doctor's Orders Rx, Inc. marijuana dispensary licensure, I have received many inquiries about whether this was a business that I was involved in." (*Id.*, ¶ 17).

- Mr. Stice states that since defendants' dispensary opened, his business "has received many phone calls about purchasing medical marijuana, if we were part of the dispensary, how long the wait would be, directions to our location, and so on." (*Id.*, ¶ 18).

35

- Mr. Stice further states that his business has "had many inquiries on Facebook as to whether our Pharmacy is involved in dispensing marijuana and had someone 'check in' on Facebook while at the Defendants' dispensary, but instead 'tagged' my business." (*Id.*, ¶ 19).

- Mr. Stice further asserts that his two pharmacies have received "approximately 60 phone calls in the first few days of the Doctor's Orders RX dispensary opening regarding marijuana." (Pl. Ex. 7, ¶ 20).

- Mr. Stice also asserts that he has not been "able to enter a restaurant or any public venue without being asked if [he] is involved in the distribution of marijuana." (*Id.*, ¶ 21).

- Mr. Stice testified that he posted on Facebook approximately "20 to 30 times" to inform the public that White Hall Pharmacy is not affiliated with defendants' dispensary (Dkt. No. 33, at 13).

- Mr. Stice testified that, while White Hall Pharmacy received approximately 60 phone calls in the first few days after the dispensary opened, it has received approximately 100 phone calls since that time (*Id.*, at 14).

- Mr. Stice testified that employees of Jefferson Regional Medical Center have asked about his involvement with the dispensary (*Id.*, at 15).

- Mr. Stice testified that a city councilman asked him if he was involved with the dispensary and that he has been asked, multiple times, about the dispensary at the country club (*Id.*, at 16).

- Mr. Stice stated that multiple physicians in the community have asked him about his affiliation with the dispensary (Dkt. No. 33, at 17).

- At the Arkansas Pharmacists Association, Mr. Stice was asked by different people about his affiliation with the dispensary (*Id.*, at 17).

- Mr. Stice testified that "every news station, local news station, contacted me, along with the *Arkansas Democrat-Gazette* and the *Pine Bluff Commercial*" about this affiliation with the dispensary (*Id.*, at 17).

- Mr. Stice was sent a text message from an individual seeking employment who stated that she was "taking online classes at a cannabis training university . . . ." (Pl. Ex. 14).

- Mr. Stice testified that at least "5 or 10 percent" of his professional customers, who make up approximately "20 to 30 percent" of his customers,

have asked about his affiliation with defendants' dispensary (Dkt. No. 33, at 20).

- Mr. Lambert avers that he was confused about the affiliation between defendants' dispensary and White Hall Pharmacy (Pl. Ex. 10, ¶ 6).

- Mr. Lambert further avers that he has "had 5 other business owners and customers in Pine Bluff ask me why Doctor's Orders Pharmacy would open a medical marijuana dispensary." (*Id.* ¶ 8).

- Mr. Lambert also testified that he was asked about Mr. Stice's affiliation with the dispensary by three customers and "two to three employees . . . ." (Dkt. No. 33, at 40).

- Ms. Cockrum avers that she was confused about the dispensary's affiliation with Mr. Stice (Pl. Ex. 15, ¶¶ 5-6).

- Mr. Spencer avers that he has received approximately "8 to 9 calls a day" since the dispensary opened from individuals who wished to purchase medical marijuana (*Id.*, ¶ 9).

- Mr. Spencer also avers that one individual called to see if he could camp outside of White Hall Pharmacy to be first in line (*Id.*, ¶ 7).

- Mr. Trafford, a customer of White Hall Pharmacy, avers that he was confused about the affiliation between defendants' dispensary and White Hall Pharmacy (*Id.*, ¶¶ 3, 7).

- Ms. Ansley, a customer of White Hall Pharmacy, avers that she initially thought Mr. Stice was affiliated with defendants' dispensary, but she has not quit using White Hall Pharmacy's services (Dkt. No. 33, at 32-34).

- Ms. Stevenson, an employee at White Hall Pharmacy, testified that during the "first week" she received approximately half a dozen phone calls relating to medical marijuana during a day of work (Dkt. No. 33, at 37). Ms. Stevenson also testified that a former employee came to the store and asked if White Hall Pharmacy was "associated with the marijuana . . . ." (*Id.*, at 38).

When evaluating this record evidence in the light of controlling Eighth Circuit precedent, the Court determines that much of this evidence "is hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender regarding the reason

for the 'confusion.'" *Duluth News-Tribune*, 84 F.3d at 1098 (citations omitted). At the summary judgment stage, analyzing a Lanham Act trademark infringement claim, the Eighth Circuit has held that evidence regarding misdirected phone calls "is hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender regarding the reason for the 'confusion.'" *Duluth News-Tribune*, 84 F.3d at 1098 (citations omitted). In that case, the Eighth Circuit concluded that mistaken phone calls were "de minimus and show inattentiveness on the part of the caller . . . rather than actual confusion." *Id.* (citation omitted). However, the record in that case is silent as to the number of misdirected phone calls.

The record evidence here is that White Hall Pharmacy received approximately 60 phone calls in the first few days after the dispensary opened and approximately 100 phone calls since that time, but there is also record evidence that White Hall Pharmacy receives approximately 100 phone calls a day per pharmacy in its usual course of business (Dkt. No. 33, at 14, 23). Ms. Stevenson, who works at the White Hall location, testified that, on one day that she worked, her location received approximately half a dozen phone calls relating to marijuana (Dkt. No. 33, at 37). She also testified that White Hall Pharmacy has continued to receive such phone calls but that such calls have decreased (*Id.*).

Further, under controlling Eighth Circuit precedent, many of the alleged incidents of actual confusion may be interpreted as proof that consumers note a distinction between White Hall Pharmacy and defendants' dispensary. *See Duluth New-Tribune*, 84 F.3d at 1098 (noting that asking to clarify an affiliation "indicates a distinction in the mind of the questioner, rather than confusion.") (citation omitted). In other words, that individuals in the community have asked Mr. Stice to clarify his relationship with defendants' dispensary may "demonstrate that potential customers do not automatically associate" White Hall Pharmacy with defendants' dispensary. *Id.*

For example, Mr. Lambert testified that, when he was first asked about Mr. Stice's affiliation with defendants' dispensary, he "assume[d] it's incorrect information." (Dkt. No. 33, at 40). Similarly, Ms. Cockrum averred that she was "surprised to hear that Lelan Stice was going to sell marijuana in Hot Springs." (Pl. Ex. 15, ¶¶ 5-6). This record evidence suggests that confusion may not have motivated some of the inquiries received by Mr. Stice and his staff; instead, such inquiries may have been driven by consumer understanding that White Hall Pharmacy and defendants' dispensary are distinct.[3]

Despite this, there are unambiguous incidents of actual confusion documented in the record before the Court. Mr. Stice received a text message from an individual seeking a job related to marijuana and someone "tagged" White Hall Pharmacy in a Facebook post related to defendants' dispensary. Mr. Lambert, Mr. Trafford, and Ms. Ansley averred that they were confused about White Hall Pharmacy's affiliation with defendants' dispensary, though there is no record evidence that any of these individuals mistakenly sought pharmaceutical services from defendants' dispensary or medical marijuana from White Hall Pharmacy. In fact, the record evidence appears to indicate that the confusion these individuals suffered was resolved.

Finally, the Court notes that only hearsay evidence was presented at the preliminary injunction hearing as support for the claim that any individual mistakenly arrived at White Hall Pharmacy's locations in search of medicinal marijuana. The Court has considered such evidence and afforded it appropriate weight. There is no record evidence that any of White Hall Pharmacy's customers have mistakenly contacted or traveled to defendants' dispensary.

---

[3] The Court notes that this type of evidence may be relevant to a false endorsement claim. The Eighth Circuit did not address this type of evidence in the light of a false endorsement claim in *Duluth News-Tribune*, as plaintiff there did not bring such a claim. *See generally Duluth News-Tribune*, 84 F.3d at 1093.

Overall, this Court is to "look to whether an appreciable number of ordinary purchasers are likely to be so misled." *Duluth News-Tribune*, 84 F.3d at 1099. Considered cumulatively, this proof, including proof of actual confusion, weighs in favor of White Hall Pharmacy's assertions that the public is actually confused about its affiliation with defendants' dispensary. Accordingly, the Court concludes that the record evidence related to actual incidents of confusion at this time provides some support for White Hall Pharmacy's misappropriation of trademark claim, based upon controlling precedent.

The final factor that the Court must consider is the degree of care exercised by the purchasers, which requires consideration of the type of product, its cost, and conditions of purchase. *SquirtCo.*, 628 F.2d at 1091. "[T]he kind of product, its cost and conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." *Id.* (quotation and citation omitted). "As a general rule, the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001).

In *First National Bank in Sioux Falls v. First National Bank, South Dakota*, 153 F.3d 885, 889 (8th Cir. 1998), the parties conceded that consumers tend to "exercise a relatively high degree of care in selected banking services," and therefore the Eighth Circuit concluded that "customers are more likely to notice what, in other contexts, may be relatively minor differences in names." Similarly, in *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 393 F.3d 755, 761 (8th Cir. 2005), the Eighth Circuit noted that a jury heard substantial evidence that potential investors in hedge funds "are financially sophisticated" and that such customers were unlikely to invest

without exercising substantial care. On the other hand, in *USA Visionary Concepts, LLC v. MR International, LLC*, Case No. 4:09-cv-00874, 2009 WL 10672094, at *6 (W.D. Mo. Nov. 17, 2009), a district court found that customers searching for a tanning lotion—the products retailed for between $40.00 and $80.00—were not likely "to invest sufficient time to learn the difference between the two products."

Purchasing medicinal marijuana in Arkansas requires that a patient first obtain a registry identification card from the State of Arkansas. *See* Ark. Admin. Code 007.16.4-IV (regarding registry identification cards). The record evidence before the Court is that defendants initially charged "$420 per ounce of dry [marijuana] flower . . . ." (Dkt. No. 21-1, at 4). The record evidence also indicates that medical marijuana "is typically purchased in smaller increments like an eighth of an ounce ($52.50) . . . ." (*Id.*). There is record evidence that individuals have called ahead to inquire about defendants' medical marijuana dispensary. This record evidence tends to support the conclusion that defendants' goods and services are not impulse purchases. Based upon this record evidence, the Court concludes that there is some indication that defendants' customers will invest some time and energy into investigating defendants' goods and services. The Court therefore finds that this factor weighs against of a finding of likelihood of confusion.

The Court concedes that this is a difficult determination to make based on the record evidence. As discussed above, four of the *Sensient* factors weigh in favor of White Hall Pharmacy, and two of the factors weigh against. Balancing these factors, considering controlling precedents, and reviewing all the record evidence presently before the Court, the Court ultimately concludes that, given record evidence of actual confusion, White Hall Pharmacy has shown that it has a fair chance of prevailing on the issue of likelihood of consumer confusion. For these reasons, at least

at this stage of the proceeding, White Hall Pharmacy has proven a fair chance of prevailing on the merits of its common law trademark infringement claim.

### 3.    False Endorsement Claim Under § 1125(a)(1)(A)

The Court next turns to White Hall Pharmacy's false endorsement claim under § 1125(a)(1)(A).  "This provision prohibits false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device."  *Dryer v. Nat'l Football League*, 814 F.3d 938, 944 (8th Cir. 2016) (citing *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103 (8th Cir. 2006) (internal quotation omitted)).  Neither party has pointed the Court to Eighth Circuit authority which permits a non-celebrity to bring a false endorsement claim under § 1125(a)(1)(A), though a leading treatise suggests that non-celebrities should be entitled to bring false endorsement claims for the use of their names in advertising.  5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 28:17 (5th ed.); *but see Uhlig LLC v. Shirley*, Case No. 6:08-cv-01208, 2011 WL 1119548, at *6 (D. S.C. Mar. 25, 2011) (holding that a plaintiff claiming false endorsement must prove that he or she is a celebrity).

If White Hall Pharmacy is entitled to bring a false endorsement claim, the Court finds that White Hall Pharmacy has shown that it has a fair chance of prevailing on the merits of this claim for the same reasons that it has shown that it has a fair chance of prevailing on the merits of its misappropriate of trademark claim.  To prove a false endorsement claim under section 43(a)(1) of the Lanham Act, "a plaintiff must provide evidence that the challenged statements are either 'literally false as a factual matter' or 'literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or [are] likely to deceive consumers.'"  *Dryer*, 814 F.3d at 944 (quoting *United Indus.*, 140 F.3d at 1180) (alteration in original); *see Facenda v. N.F.L.*

*Films, Inc.*, 542 F.3d 1007, 1021 (3d Cir. 2008) (noting that the "likelihood of confusion" test applies to false endorsement claims brought under 15 U.S.C. § 1125(a)(1)(A)). "Evidence that some consumers 'misunderstood' a statement, however, is insufficient . . . where the statement is not objectively 'misleading [or] false.'" *Id.* (quoting *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 393-94 (8th Cir. 2004) (alteration in original)). There is no record evidence that defendants have made factually false representations either through their marks or public statements. The Court has addressed elsewhere in this Order White Hall Pharmacy's proof regarding a likelihood of confusion on the part of consumers. Accordingly, balancing these factors, considering controlling precedents, and reviewing all the record evidence presently before the Court, the Court concludes that White Hall Pharmacy has demonstrated that it has a fair chance of prevailing on the merits of its false endorsement claim.

### 4.    Tortious Interference

White Hall Pharmacy also alleges tortious interference with a contractual relationship or business expectancy (Dkt. No. 1, at 11). To establish its claim of tortious interference with business expectancy, White Hall Pharmacy must prove: "(1) it had a business expectancy with a third party; (2) [defendants] knew of the expectancy; (3) [defendants] intentionally interfered and caused a breach or termination of the expectancy; and (4) it resulted in damages." *Apprentice Information Systems, Inc. v. Datascout, LLC*, 544 S.W.3d 39, 43 (Ark. 2018). A "necessary element of the cause of action for tortious interference requires that the [contractual or business expectancy] be terminated or breached." *Farm Credit Midsouth, PCA v. Bollinger*, 548 S.W.3d 164, 172 (Ark. Ct. App. 2018) (citing *Navorro-Monzo v. Hughes*, 763 S.W.2d 635, 636 (Ark. 1989)). For example, in *Farm Credit Midsouth, PCA*, the court held that because the plaintiff's

relationship with its customer continued, "albeit on somewhat different terms than before," the plaintiff failed to prove a termination or breach of a business expectancy. 548 S.W.3d at 172.

Here, the only record evidence that defendants' knew of any business expectancy held by White Hall Pharmacy is that defendants received a cease and desist letter from White Hall Pharmacy's counsel in May 2019 (Pl. Ex. 5). There is no record evidence currently before the Court that defendants intentionally sought out to interfere with, breach, or terminate White Hall Pharmacy's business expectancies. Furthermore, while White Hall Pharmacy argues that it has been harmed by defendants' alleged use of similar marks, there is no record evidence that White Hall Pharmacy has been harmed by a decrease in sales, revenue, or customers. The record evidence at this stage includes only speculation that White Hall Pharmacy's reputation has been harmed resulting in damage to White Hall Pharmacy. For these reasons, the Court finds that White Hall Pharmacy has failed to show that it has a fair chance of prevailing on its claim for tortious interference with a contractual relationship or business expectancy on the record evidence currently before the Court.

### 5.      Unjust Enrichment

White Hall Pharmacy also alleges unjust enrichment (Dkt. No. 1, at 12). To establish its claim of unjust enrichment, White Hall Pharmacy must show that a party has "received something of value to which [it] is not entitled and which [it] must restore." *Derrick v. Derrick*, 477 S.W.3d 577, 580 (Ark. Ct. App. 2015) (citing *Campbell v. Asbury Auto., Inc.*, 381 S.W.3d 21 (Ark. 2011) and *Feagin v. Jackson*, 419 S.W.3d 29, 33 (Ark. Ct. App. 2012)). To the extent White Hall Pharmacy argues that defendants have received commercial benefit by coopting the goodwill associated with White Hall Pharmacy's marks, the Court notes that there is no record evidence that defendants have benefitted from White Hall Pharmacy's advertising or customer goodwill. As

44

there is no record evidence that defendants have gained any customers or revenue at White Hall Pharmacy's expense, the Court concludes that White Hall Pharmacy has failed to show a fair chance of prevailing on its claim for unjust enrichment.

## B.  Irreparable Harm, Balance of Equities, and Public Interest

The Court concludes that, based upon the present record evidence and controlling Eighth Circuit precedent, White Hall Pharmacy has shown a threat of irreparable harm.  A threat of irreparable harm exists when a party demonstrates a harm that may not be compensated by money damages in an action at law.  *See Kroupa*, 731 F.3d at 820; *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371-72 (8th Cir. 1991).  "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."  *United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 741 (8th Cir. 2002).

White Hall Pharmacy argues that, if there is evidence of actual confusion, then the threat of irreparable harm should be presumed (Dkt. No. 35, at 2).  *See Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 403 n.11 (8th Cir. 1987); *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir. 1980).  Some courts examining even unregistered marks have applied a presumption in trademark cases that irreparable harm exists if a plaintiff establishes likelihood of confusion.  *See TWTB, Inc. v. Rampick*, 152 F. Supp. 3d 549, 577 (E.D. La. 2016) (applying the presumption to unregistered trademark); *Delta Sigma Theta Sorority, Inc. v. Bivins*, 215 F. Supp. 3d 17, 20 (D.D.C. 2013) (same).  However, the Eighth Circuit Court of Appeals very recently in a trademark infringement dispute acknowledged that "[i]t is unclear whether the traditional presumption of irreparable harm in trademark cases has survived more recent Supreme Court opinions emphasizing the movant's burden to show that 'irreparable injury is *likely* in the absence of an injunction.'"  *Phyllis Schlafly Revocable Trust v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019)

(emphasis in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391-94 (2006) (rejecting a "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances.")). Some courts in other circuits have declined to apply the presumption. *See Grout Shield Distributors, LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 402 (E.D.N.Y. 2011) ("[A] presumption of irreparable injury is no longer appropriate in a trademark case where plaintiff can establish a likelihood of confusion."). The Third and Ninth Circuit Courts of Appeal have abandoned the presumption altogether. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). As a result, it is unclear if that presumption still applies in trademark cases in the Eighth Circuit.

Here, because the Eighth Circuit has not clearly abandoned the presumption, the Court will apply the presumption. The Court concludes that irreparable harm to White Hall Pharmacy is presumed based on evidence of actual confusion.

If the presumption does not apply, the question of whether White Hall Pharmacy has demonstrated irreparable harm is more difficult. "[A]bsent evidence of an injury, much less an irreparable one, [plaintiff] cannot obtain an injunction." *Infogroup, Inc. v. DatabaseLLC*, 95 F. Supp. 3d 1170, 1187 (D. Neb. 2015). As discussed above, the record evidence is not clear about the extent to which the parties are competing, if they are in fact competing at all given that they do not sell the same products. Also, the record evidence is not clear that White Hall Pharmacy and defendants are operating in overlapping markets where there is significant market penetration by either party. These two factors make it difficult for the Court to determine the extent, if any, of White Hall Pharmacy's alleged economic injury.

46

Additionally, except for conclusory speculation that White Hall Pharmacy's reputation has been harmed, there is no record evidence before the Court that White Hall Pharmacy's reputation or goodwill among the community has been harmed because of defendants' alleged actions or that such harm, even if it exists, has resulted in a loss of sales, revenue, or customers for White Hall Pharmacy. White Hall Pharmacy maintains that there is evidence of actual confusion and that such confusion is damaging its business reputation, which it has worked since 2009 to develop through continuous operation under the same name. By comparison, defendants only recently began operating; there is no evidence in the record regarding costs associated with re-identifying defendants' dispensary.

Given all of these considerations, the Court determines the balance of equities and the public interest weigh in favor of a preliminary injunction.

## VI. Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In these proceedings, defendants have neither requested security in the event this Court grants a preliminary injunction nor have they presented any evidence that they will be financially harmed if they are wrongfully enjoined. For these reasons, the Court declines to require security from White Hall Pharmacy.

## VII. Scope Of Relief

The Court writes separately to address the scope of the requested preliminary injunction. White Hall Pharmacy requests an injunction from the Court ordering defendants "to immediately cease using Plaintiff's name, terms, and symbols in public business operations and

advertising . . . ." (Dkt. No. 2, ¶ 14).   In its post-hearing briefing, White Hall Pharmacy "narrow[ed] the scope of its requested injunction and request[ed] that the Court order Defendants to immediately cease holding themselves out under the 'Doctor's Orders' moniker to the public within the State of Arkansas." (Dkt. No. 35, at 24).   The scope of the relief White Hall Pharmacy seeks goes beyond what the record evidence before the Court supports.

The Court is not convinced that the record evidence shows that White Hall Pharmacy's market penetration extends significantly beyond the Pine Bluff area.   Similarly, it is unclear if defendants' medical marijuana dispensary serves customers throughout Arkansas, the Hot Springs area, or some other region.   In other words, it is unclear if defendants' marks compete with White Hall Pharmacy's marks in any market, including the Pine Bluff area.   Based on the evidence of actual confusion in the record, however, the Court concludes at least at this stage of the litigation that more likely than not White Hall Pharmacy and defendants' dispensary both serve customers in the Pine Bluff area.

For these reasons, the Court grants White Hall Pharmacy a preliminary injunction only in the Pine Bluff area, which this Court construes as Jefferson County, Arkansas.   The Court enjoins defendants, and all those acting in concert with them, from holding themselves out under the "Doctor's Orders" moniker, or any combination of words with "Doctor's Orders," to the public within Jefferson County, Arkansas.   This includes a prohibition on any signage and any advertising that can be viewed by consumers within Jefferson County, Arkansas.[4]

---

[4]  The Court does not intend for its preliminary injunction to alter the regulations governing defendants' ability to advertise.  *See* Ark. Admin. Code 006.02.7-17.

**VIII. Conclusion**

For these reasons, the Court determines that White Hall Pharmacy has met its initial burden for a preliminary injunction in regard to the Pine Bluff area, which this Court construes as Jefferson County, Arkansas. The Court enjoins defendants, and all those acting in concert with them, from holding themselves out under the "Doctor's Orders" moniker, or any combination of words with "Doctor's Orders," to the public within Jefferson County, Arkansas. This includes a prohibition on any signage and any advertising that can be viewed by consumers within Jefferson County, Arkansas. The Court therefore grants in part White Hall Pharmacy's emergency motion for preliminary injunction (Dkt. No. 2). This preliminary injunction will remain in effect until further Order from the Court. No party is barred from seeking modified or additional relief.

It is so ordered this 20th day of August 2019, at 10:45 a.m.

Kristine G. Baker
United States District Judge